## Affidavit of Special Agent Eric M. Kotchian

I, Eric M. Kotchian, being duly sworn, do hereby depose and state the following:

### Background

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF) and have been so employed since July 2002. Previously, I was employed as a Deputy U.S. Marshal for approximately four years and a Deputy Sheriff with the Essex County Sheriff's Department in Massachusetts for approximately five years. As an ATF Special Agent, I am responsible for investigating criminal violations of the Federal alcohol, tobacco, firearms, arson, and explosives laws. During my career as a Federal law enforcement officer, I have participated in the execution of numerous arrest warrants and search warrants.

2. This affidavit is submitted in support of a criminal complaint and application for arrest warrant for William T. GAINES, ("GAINES") (born in 1971). The information contained in this affidavit is based on my personal involvement in this investigation, my training and experience, my review of documents, and information provided to me by other law enforcement officers. This affidavit does not contain all of the information I possess about this investigation, but only that which I believe is necessary to support the criminal complaint and arrest warrant application.

### Origin of Investigation

3. On December 30, 2003, I received information from ATF Special Agent Frank Tortorella that Sergeant Robert Parisi ("Sgt. Parisi") of the Acton (Massachusetts) Police Department was requesting ATF assistance regarding a possible violation of federal firearms laws involving a felon in possession of a firearm.

1

4. On this same date, I spoke, via telephone, with Sgt. Parisi, who informed me that he was currently investigating GAINES for numerous offenses involving bank fraud and credit card fraud. Sgt. Parisi also informed me that GAINES was a convicted felon with a lengthy Massachusetts criminal history, who had been incarcerated in the mid 1990's as a result of an investigation that was conducted by the Massachusetts State Police. Sgt. Parisi told me that he believed that GAINES may be in violation of federal firearms laws because during his investigation, he learned from one of GAINES' victims that GAINES had been in possession of a firearm.

5. On December 31, 2003, I spoke with Sgt. Parisi via telephone, again. He informed me that the identity of the victim who told him that GAINES had been in possession of a firearm was Lyndsey Allison ("ALLISON") of Braintree, Massachusetts. He told me that ALLISON was willing to speak to ATF Special Agents about GAINES.

### Interview of Lyndsey ALLISON

6. On January 6, 2004, Sgt. Parisi, ATF Special Agent Michael Curran and I interviewed ALLISON. ALLISON has no criminal record and she has not provided information to me in the past. ALLISON told us that on approximately May 25, 2003, she met GAINES at the Vertigo Club, which is located in Boston, Massachusetts. Upon meeting GAINES, ALLISON told us that he showed her a police badge and identified himself as an undercover Boston Police Officer, who was assigned to the Boston Police Department's Drug and Gang Unit. Additionally, when ALLISON met GAINES, GAINES told her that he was on duty and working an undercover detail in the Vertigo Club. ALLISON told us that on the same night that she met GAINES, she also met Gary WILLIAMS, who was introduced to her by GAINES as his cousin and partner on the

Boston Police Department.

7. ALLISON said that a short time after meeting GAINES at the Vertigo Club, they began dating. ALLISON stated that she dated GAINES until approximately sometime in September 2003. ALLISON said that at some point, while they were dating, GAINES told her that he and WILLIAMS were on suspension from their jobs as Boston Police Officers because they were accused of selling bullets on the street. ALLISON stated that GAINES and WILLIAMS have a close relationship and she described them as being inseparable.

8. ALLISON stated that on approximately July 26, 2003, she added GAINES to her Fleet Bank checking account. However, ALLISON stated she did not give GAINES permission to sign her name to any of the bank checks that were associated with the checking account. Additionally, ALLISON told us that, while they were dating, she took a personal loan in her name in the amount of seventeen thousand dollars, so that GAINES could purchase a Lincoln Navigator Sport Utility Vehicle ("Navigator SUV"). ALLISON informed us that GAINES is currently in possession of the Navigator SUV, which bears New Hampshire registration number, KCW-3.

9. ALLISON stated that in approximately early August 2003, she became aware that GAINES was in possession of a handgun. ALLISON became aware that GAINES was in possession of a handgun because he dropped his handgun on the tile floor in her apartment. ALLISON said that GAINES told her that he had purchased his handgun by himself, but GAINES did not tell her at that time how he paid for his handgun. ALLISON said that she did not think it was out of the ordinary for GAINES to possess or carry a handgun because she believed at that time that GAINES was a Boston Police Officer.

10. ALLISON described GAINES' handgun as being black, big, heavy and metallic colored

and that it looked similar to Sgt. Parisi's semiautomatic duty handgun. Additionally, ALLISON described GAINES' handgun as being the type of handgun that if the top of the handgun were pulled back, the bullets would come out of the top of the handgun (i.e., a pistol). ALLISON witnessed bullets come out of the top of GAINES' handgun when he pulled back the top of his handgun.

11. ALLISON said that GAINES carried his handgun on his person in an in-the-pants style holster. ALLISON provided me with a plastic bag that she described as the packaging for the holster that GAINES had purchased for his handgun. Upon looking at the plastic bag, I recognized it to be the packaging for a semi-automatic handgun holster that was sold under the brand name, "Shooting Systems". ALLISON informed us that sometimes, GAINES would let his handgun hang out of his pants so that people could see that he was carrying his handgun. ALLISON stated that GAINES sometimes stored his handgun in her apartment in her bedroom, under her bed in the dark blue case that contained the handgun when it was purchased. ALLISON said that GAINES also stored his handgun in the Navigator SUV. ALLISON also saw GAINES in possession of ammunition that he also stored in her bedroom, under her bed, in a white cardboard box.

12. ALLISON admitted that in addition to witnessing GAINES in possession of his handgun, she also held GAINES' handgun in her hands.

13. ALLISON said that after introducing GAINES to her parents, her mother made her aware of the fact that GAINES had been arrested and imprisoned in the past for defrauding women. ALLISON said that her mother showed her copies of newspaper articles from the Boston Herald that spotlighted GAINES and the circumstances surrounding his May 1996 arrest by the

Massachusetts State Police. ALLISON told us that her mother advised her to check her bank account and bank account checkbook to make sure that GAINES had not victimized her in the same manner that he had victimized the women in 1996.

14. Thereafter, ALLISON reviewed her bank account and bank account checkbook and she discovered that GAINES had been writing bank checks from her checking account and signing her name to them. In particular, ALLISON told us that she noticed one bank check, bearing check number 1122, that was dated 07/31/2003 and made payable to Four Seasons in the amount of three hundred ninety-eight dollars and eighty-five cents ($398.85). ALLISON said that she did not write or sign the bank check and did not give GAINES the authorization to sign her name to the bank check. ALLISON provided me with a copy of bank check number 1122 from her Fleet Bank checking account that was provided to her by Fleet Bank. ALLISON stated that when she questioned GAINES about the bank check, GAINES told her that the bank check was used to purchase his handgun. ALLISON stated that GAINES told her that the bank check was made payable to Four Seasons because it was the place from which he purchased his handgun. ALLISON also said that GAINES told her that he had someone purchase the handgun for him at Four Seasons. ALLISON further stated that she asked GAINES why he was in possession of the handgun, if he was not supposed to be in possession of a handgun because of his criminal record, and GAINES responded that he needed the handgun for safety, due to his criminal activity.

15. ALLISON relayed that in November 2003, on approximately the Saturday before Thanksgiving, GAINES attempted to break into her apartment. As a result of this incident, ALLISON filed for a Restraining Order against GAINES at Quincy (Massachusetts) District Court. A Restraining Order was issued by the Quincy District Court and was served upon

GAINES. ALLISON said that sometime after being served with the Restraining Order, GAINES telephoned her and began yelling at her for taking out the Restraining Order against him. ALLISON stated that GAINES was angry with her for telling the court that he had a handgun. According to ALLISON, GAINES never turned the handgun over to the Braintree (Massachusetts) Police Department or any law enforcement agency, as he was ordered to do pursuant to the Restraining Order. ALLISON reported that GAINES was worried that he was going to get into trouble for possessing the handgun.

### January 16, 2004 Consensual Call between ALLISON and GAINES

16. On January 16, 2004, under my direction, ALLISON placed a consensually monitored and taped telephone call from her cellular telephone ((617) 799-0906) at the Acton Police Department Headquarters in Acton, Massachusetts to GAINES' cellular telephone at ((781) 706-7707). ALLISON told me that GAINES' cellular telephone service is through Nextel Communications. ALLISON told me that she knows about GAINES cellular telephone service because GAINES' cellular telephone service is part of her cellular telephone service account with Nextel Communications. During this telephone call, ALLISON did not speak to GAINES, but she left him a voicemail requesting that he return her call. A short time after ALLISON's initial telephone call to GAINES, GAINES called ALLISON on her cellular telephone from an unknown location and unknown telephone number. Under my direction, the telephone call from GAINES to ALLISON was consensually monitored and tape-recorded. During this telephone call, among other matters, ALLISON and GAINES discussed the following. ALLISON told GAINES that she needed money and she asked GAINES if he could give her some of the money that he made from the sale of his gun (reference to the handgun that ALLISON witnessed in

GAINES' possession). GAINES responded to ALLISON's question by telling ALLISON that he already gave her some of the money that he gained from selling his gun. ALLISON reminded GAINES that he used money from their bank account to pay for the gun when he originally bought the gun. GAINES told ALLISON that he realized that he used money from their bank account to buy the gun and he also told ALLISON that he put money into the account for the purpose of buying the gun. GAINES also told ALLISON that he knew what he was doing when he put the money for the gun into the bank account. ALLISON asked GAINES how much money he made from selling his gun and if he sold the gun or if WILLIAMS sold the gun. GAINES responded to ALLISON's question by telling ALLISON that WILLIAMS took the gun and sold it without him knowing. GAINES said that he learned that WILLIAMS sold the gun when WILLIAMS told him that he had sold the gun and had given ALLISON two hundred and fifty dollars from the money that was made from the sale of the gun. GAINES said that he questioned WILLIAMS as to why he sold the gun and GAINES told ALLISON that he told WILLIAMS that he should not have sold the gun without letting him know about it. ALLISON asked GAINES if WILLIAMS took the gun from him and GAINES recanted his earlier statement and he told ALLISON that he gave WILLIAMS the gun, so that he could hold on to it for him. ALLISON asked GAINES if he left bullets in her bedroom because she told GAINES that she recently found bullets while she was cleaning. ALLISON told GAINES that the bullets were contained in a white box like the box she had seen bullets in before. GAINES asked ALLISON if there were bullets in the box and when ALLISON told GAINES that the box was half full with bullets, GAINES told her that the bullets belonged to him.

## Interviews of Carl Ingrao

17. On, January 15, 2004, I interviewed Carl Ingrao ("INGRAO"), who is the owner of Four Seasons Firearms at the location of Four Seasons Firearms in Woburn, Massachusetts. At my request, INGRAO reviewed the documents associated with the sale of the firearm that was purchased on July 31, 2003 with the check drawn on ALLISON's Fleet Bank Account. He informed me that on that day, WILLIAMS purchased a Smith & Wesson, Model CS 40, .40-caliber semi-automatic handgun, bearing serial number TDS4224, from Four Seasons Firearms. INGRAO provided me with the original ATF Firearms Transaction Record, which is otherwise referred to as an ATF Form 4473 and is required by Federal law to be used to record the sale or transfer of a firearm or firearms between a Federal Firearms Licensee and an individual. INGRAO also provided me with the original Massachusetts Firearms Transaction Form, which is otherwise referred to as an FA-10 and is required by law to be used to record the sale or transfer of a firearm or firearms between individuals.

18. While at the location of Four Seasons Firearms, I learned that Four Seasons Firearms sells semi-automatic handgun holsters that are sold under the brand name "Shooting Systems". I personally observed holsters on display inside of the location Four Seasons Firearms that were packaged in plastic bags that were marked "Shooting Systems". The plastic bag packaging for the "Shooting Systems" brand semi-automatic holsters that I observed in the location of Four Seasons Firearms appears to me to be similar to the plastic bag packaging for the "Shooting Systems" brand semi-automatic handgun holster that was provided to me by ALLISON.

19. On January 22, 2004, I spoke again, via telephone, with INGRAO. INGRAO also told me that, in addition to being the owner of Four Seasons firearms, he is also the custodian of the

records for Four Seasons Firearms. I also asked INGRAO if Four Seasons Firearms sells handgun holsters that have the brand name "Shooting Systems" and INGRAO told me that Four Seasons Firearms does sell handgun holsters that have the brand name "Shooting Systems".

### Interview of Betty Cote

20. On January 16, 2004, I spoke twice, via telephone, with Betty Cote ("COTE"), who is employed as a records clerk by Smith & Wesson in Springfield, MA. During the first telephone conversation I had with COTE, she confirmed that Smith & Wesson did manufacture the Smith & Wesson, Model CS 40, .40 caliber semi-automatic handgun, bearing serial number TDS4224, the handgun that WILLIAMS had purchased from Four Seasons Firearms on July 31, 2003. During the second telephone conversation that I had with COTE, she confirmed that the Smith & Wesson, Model CS 40, .40 caliber semi-automatic handgun, bearing serial number TDS4224, had been shipped in interstate commerce. COTE told me that, according to the Smith & Wesson computer database, on 11/02/2000, the Smith & Wesson, Model CS 40, .40-caliber semi-automatic handgun, bearing serial number TDS4224, was shipped from the Smith & Wesson manufacturing plant in Springfield, Massachusetts to the RSR Group, which is located at 8817 West Lynx Avenue in Milwaukee, Wisconsin.

### Criminal Record of GAINES

21. During the course of this investigation, I have obtained and reviewed a copy of a computerized printout of GAINES' Massachusetts Criminal History and NCIC III Criminal History. Upon reviewing GAINES' Massachusetts Criminal History, I learned that GAINES has an extensive criminal history with one hundred and twenty (120) adult arraignments in Massachusetts. Several of GAINES' arraignments and convictions are for charges that include,

but are not limited to, Larceny Over $250.00, Impersonating a Police Officer, Forgery, Uttering, and Credit Card Misuse. GAINES has several felony convictions that include, but are not limited to, two (2) convictions for Larceny Over $250.00 for which he received state prison sentences of four to five years (4-5 years) and I have obtained the official Massachusetts Trial Court records for these convictions. The information for these convictions is as follows:

**Suffolk County Superior Court**
Docket 9611 CR 089001, Conviction on March 3, 1997, for Massachusetts General Law Chapter 266, Section 30, Larceny Over $250.00.

**Essex County Superior Court-Newburyport**

Docket 9677 CR 2789, Conviction on March 5, 1997, for Massachusetts General Law Chapter 266, Section 30, Larceny Over $250.00.

It should be noted that the Larceny Over $250.00 convictions are offenses which are punishable by imprisonment for a term exceeding one year. These convictions prohibit a person from possessing a firearm under federal law.

## Conclusion

22. Based on the foregoing, there is probable cause exists to believe that William T. GAINES did possess, in Massachusetts, a firearm, to wit: a Smith & Wesson, Model CS 40, .40 caliber semi-automatic handgun, bearing serial number, TDS4224, that was shipped in interstate or foreign commerce, after being convicted of a crime punishable by imprisonment for a term

exceeding one year, in violation of Title 18, United States Code, Section 922(g)(1).

Signed under the penalties of perjury on this the __19th__ day of February, 2004.

_____
ERIC M. KOTCHIAN
Special Agent
ATF

Subscribed and sworn before me on this date the __19th__ day of February, 2004, at ___Boston___, Massachusetts.

_____
CHARLES B. SWARTWOOD
UNITED STATES MAGISTRATE JUDGE

11